**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**CIVIL ACTION**
**NO. 06-400-S**

**JOHN SOUZA,**
**Plaintiff,**

**VS.**

**TALLMAN & MACK, INC.,**
**Defendant.**

## DEFENDANT’S PRETRIAL MEMORANDA

Now comes the defendant, Tallman & Mack, Inc., in the above-entitled action, by and through its counsel of record, Clinton & Muzyka, P.C., and submits herewith its Pretrial Memoranda pursuant to the Order of this Honorable Court.

### I. INTRODUCTION

This matter involves a personal injury action brought by a member of the crew of the F/V MARIA MENDONSA on April 21, 2004. The action is brought pursuant to the Jones Act, 46 U.S.C. §688, General Maritime Law for the unseaworthiness of the vessel and General Maritime Law for maintenance and cure benefits. Plaintiff admits that the crew was fit and that nothing onboard the vessel failed which caused his injury. He also admits that he was paid maintenance and cure benefits and that he is not aware of any outstanding

medical bills. Thus, this matter is strictly a case of negligence under the Jones Act.

**II. <u>INCIDENT</u>**

Plaintiff presents as a **69** year old resident of 163 Locust Avenue, Portsmouth, Rhode Island. He is married with four adult children.

He worked on a farm during junior high school and high school. Subsequent to graduation, he worked in a mill in Fall River in the receiving and shipping department for two months. In April/May, 1956 he began working for Tallman & Mack and has been in their employ to the present. At the time he began working for Defendant, Tallman & Mack operated two vessels out of the Spring Wharf in Newport, Rhode Island. It utilized the same fishing system as it presently utilizes, catching fish in a trap with a lengthy leader to guide the fish into the trap opening.

The F/V MARIA MENDONSA was purchased by Tallman & Mack in 1962. He described it as a 55’ deck vessel built for the fish trap industry. According to the Defendant, the vessel has no fair market value due to its age and lack of equipment.

Tallman & Mack was operated by George Mendonsa until 1997. At that time, Alan Wheeler, Adam Lotz and Jack Van

Hof of the Point Trap Company purchased Tallman & Mack and combined the operations. Point Trap is also engaged in the fish trap industry, so the combination was efficient. He had not worked with Mr. Wheeler prior to the merger.

The traps for the F/V MARIA MENDONSA are set off Lands End, which is opposite the Doris Duke mansion at the end of Bellevue Avenue in Newport, Rhode Island. That is only a short transit from the vessel's homeport and Tallman & Mack's business location at Sakonnet Point in Little Compton, Rhode Island. When Plaintiff began working at Tallman & Mack in the 1950s, he would work three seasons, taking the winter off. However, when the restrictions on striped bass went into place in the 1980s, the fish trap season was reduced to May-October. Plaintiff would then collect unemployment for the fall/winter.

The fishing operation, although it appears complicated, is actually quite simple, operating much the same as a lobster trap. The trap is set approximately 250 fathoms (1500 feet) offshore, with the opening to the trap facing inshore. From the opening of the trap, a leader line is extended shoreward. The floating leader line has twine draped from it. The principle is simple: the fish swim along and as they approach the twine they are

diverted into the trap. Once in the trap, the fish are unable to escape.

The incident occurred on April 21, 2004. After working ashore for about 10 days getting the gear ready for the season, they were in the process of setting the trap off Lands End. This is done by use of the F/V MARIA MENDONSA and two skiffs. They had completed setting the trap and its anchors and were in the process of setting the leader line. On the FV MARIA MENDONSA at the time were Captain Wheeler, Plaintiff, Adam Lotz, Joseph Linhares, Sr., Jay Linhares, and Brian Cambra. The rest were in the work skiffs.

Plaintiff testified that it generally takes about 1½ to 2 hours to set the leader line. He testified that in the past George Mendonsa had been the Captain of the F/V MARIA MENDONSA, but he was sick that day with a cold. Captain Alan Whee wanted to get the traps set, so he assumed the position. Plaintiff admitted that he had no objection to Captain Wheeler, that he was a competent captain and that he could have elected not to work that day if he had any concerns about Captain Wheeler’s ability.

The weather was fair, but the wind and current affected Captain Wheeler’s ability to turn the vessel.

The accident occurred at approximately 1000 hours. There had been no problems up to that time, Plaintiff was not aware of any crewmember complaints and no equipment had failed. There was nothing that appeared to be unsafe about the equipment or the operation of the vessel by Captain Wheeler.

The running line had already been put in place, along with anchors set approximately every 50 fathoms (300 feet) to hold the line in position. They were in the process of securing the leader line to the trap so they could proceed shoreward to lay it into place. The leader line was piled on the aft deck of the vessel. The procedure was for Captain Wheeler to bring the vessel in along the running line and then follow the running line into the trap, spinning the F/V MARIA MENDONSA so the stern would be near the trap opening and the work skiff could take the line and attach it to the trap. As Captain Wheeler was bringing the stern around, the wind and current were working against the vessel. According to Plaintiff, Captain Wheeler turned the vessel too soon. He believed that Captain Wheeler was afraid to get too close to the trap. In this position, the vessel is perpendicular to the running line, with the line against the vessel's stern bits. Plaintiff admitted that he was the "deck boss" and

was getting upset with the slowness of the operation. He and Brian Cambra were pulling on the running line to help turn the stern. This proved unavailing. Then Plaintiff decided to throw a line to the work skiff to assist in turning the vessel. The last he saw, the running line was between the two stern bits and the vessel was in reverse gear, pushing it against the running line. As he was walking forward to put the line that he threw to the work skiff on the winchhead amidship, according to the Plaintiff the line jumped the stern bit because the vessel was in reverse.

Defendant maintains that, in fact, Plaintiff himself removed the line from the bit. According to Mr. Lotz, who was on the vessel amidships, he observed the line off the bit and was in the process of grabbing a piece of line to rope to tie the line to the bit when the line swept the deck. Brain Cambra was next to the Plaintiff on the stern of the vessel and he saw the Plaintiff lift the line over the bit. Mr. Cambra recognized that that was not a prudent thing to do and stepped over the line, thereby avoiding any injury. Even Joseph Linhares, Jr., who gave a version of events that was so different from all other witness’ testimony that his presence on the vessel is suspect, placed the Plaintiff in the vicinity of the stern

bit when the accident occurred. Defendant will offer Captain John Wilson as an expert witness who will testify that because of the configuration of the stern bit and the forces on the running line, the most likely reason for the line coming over the bit was that someone removed the running line from the bit.

As a result of being removed from the bit, the line was unconstrained and jumped over the leader line piled on deck and struck the Plaintiff, propelling him to the vessel rail. Plaintiff did not know what portion of his body hit the portside rail but he ended up in the water with his eyes closed. When he came to the surface, Jay Linhares had extended the gaff and he grabbed it and was brought aboard.

Plaintiff has no lost wages. After the incident, he was paid maintenance and cure benefits and advances equal to his $600 per week salary. When he reached maximum medical cure, he returned to work for Tallman & Mack shoreside, mending nets. He is paid the same salary and will be employed in this position as long as he is able.

Plaintiff was last seen by Dr. Das, his treating physician, in August, 2004. He was treated at Vanderbilt Rehabilitation Center for only a few days because he was

able to return to work on light duty. Plaintiff has total medical bills at a level less than $5,500.00

Defendant will offer the following witnesses in the defense of this case.

1. Captain Allan Wheeler

Captain Wheeler will testify as to the history of the company and the details of the fishery. He will also testify about the incident and the events of April 21, 2004. Captain Wheeler will testify about the events leading up to the incident. He will testify about the payment of Plaintiff for wages, both before and after the incident. Lastly, Captain Wheeler will testify about the value of the M/V MARIA MENDONSA on the date of the incident. Captain Wheeler will introduce photographs of the vessel and explain that the line could not have jumped the bit because of the lip on the bit and explain that the bit was not damaged or in any way positioned to facilitate the jumping the bit. He will also testify about the line and bit dimensions.

2. Adam Lotz

Adam Lotz will testify that he is an officer of the corporation and principally responsible for the sale of the fish. He will testify that Plaintiff was angry that the stern of the F/V MARIA MENDONSA was being pivoted

slowly and was yelling at Captain Wheeler to bring the stern of the vessel around so they could connect the leader line to the trap. He will testify that Plaintiff was the deck boss and responsible for the operation of the deck. He will also testify as to his observations of the Plaintiff at the time of the incident.

3. Brian Cambra

Brian Cambra was a member of the crew of the F/V MARIA MENDONSA on April 21, 2004. He will testify about his observations of the Plaintiff and Plaintiff’s actions that lead up to the incident.

4. Captain John Wilson- Expert

Captain Wilson will testify about his review of the deposition transcripts, photographs of the vessel and his inspection of the vessel and the stern bit. He will render an opinion that the most likely reason that the running line jumped the bit was that it was physically removed by someone, due to the lip on the bit and the operational forces. He will also testify that the F/V MARIA MENDONSA would have no fair market value, other than scrap value, due to its age and necessity for extensive refurbishment if it were to be utilized in any other fishery. He will estimate the scrap value of the vessel.

5. Dr. Samuel Greenblatt- Expert

Dr. Greenblatt will testify as to his review of the medical records and his examination of the Plaintiff. He will testify as to the disability of the Plaintiff.

6. Steven Cashione- Expert

Mr. Cashione is a weather expert and he will testify as to the weather conditions at 1000 on April 21, 2004, including the wind speed and direction and the direction of the current.

## III. LAW

The plaintiff has asserted a negligence claim under the Jones Act, which allows a seaman to recover damages against his employer, and claims for Unseaworthiness, and Maintenance & Cure under the General Maritime Law. In order for liability to attach under the Jones Act, the plaintiff must establish that a dangerous condition existed onboard the defendant’s vessel, the defendant had notice and an opportunity to correct the alleged unsafe condition, and that the alleged unsafe condition caused or contributed to the injuries he sustained. *See, i.e. Perkins v. American Elec. Power Fuel Supply, Inc., 246 F.3d 593 (6th Cir. 2001).*

As for Unseaworthiness, the plaintiff has the burden of proving that the M/V MARIA MENDONSA was not reasonably fit for its intended purpose, and further that the alleged

unseaworthy condition proximately caused his injuries. Pursuant to the warranty of seaworthiness, the defendant is not required to furnish an accident-proof vessel, the best appliances or equipment, or the finest crewmembers. The defendant is only required to furnish a vessel, including its equipment and crewmembers, which is reasonably fit for a seaman exercising ordinary care. It is not the duty of the owner to provide a vessel which is safe for the negligent seaman*. See, i.e. Mitchell v. Trawler Racer, Inc., 362 U.S. 539 (1960); Tarabochia v. Johnson Line, Inc., 440 F.2d 187 (Wash. 1968).* Plaintiff has admitted that there was no equipment failure that caused his injury and has not maintained that the crew of the vessel was so incompetent as to render the vessel unseaworthy. Instead, Plaintiff's only allegation is that Captain Wheeler was negligent in his operation of the vessel by turning too soon to allow the stern to come around so the leader line could be attached to the fish trap.

The remaining General Maritime Law claim asserted by the plaintiff is not compensatory in nature. A vessel owner is obligated to furnish a seaman who becomes injured or ill while in the service of its vessel with Maintenance & Cure benefits. Maintenance is a subsistence allowance

designed to provide the seaman with compensation comparable to the food and lodging he received onboard the vessel. Cure is the vessel owner's obligation to pay for incident-related medical treatment, which is curative as opposed to palliative in nature. *Whitman v. Miles, 387 F.3d 68, 71-72 (1st Cir. 2004).*

A vessel owner's no-fault Maintenance & Cure obligation continues until the seaman reaches maximum cure. *Id.* A seaman is not entitled to maintenance unless he actually incurs a cost. *Harper v. Zapata Off-Shore Co., 741 F.2d 87 (5th Cir. 1984)*. For instance, if a seaman is living at home with his parents during recuperation, then he has not incurred an expense and is not entitled to recover Maintenance. *United States v. Johnson, 160 F.2d 789 (9th Cir. 1947).*

Defendant additionally maintains that the plaintiff is comparatively at fault for his injuries. The standard for determining causation under the Jones Act is identical for comparative fault. Causation under the Jones Act requires the plaintiff to prove that the "vessel's negligence played any part, even in the slightest, in producing the injuries for which the plaintiff seeks damages." *Napier v. F/V DEESIE, INC., 454 F.3d 61, 67 (1st Cir. 2006).* Applying this standard, the plaintiff is comparatively at

fault if his negligence played any part, even in the slightest, in producing the injuries he sustained. *Norfolk Southern Railway Co. v. Sorrell*, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007).

A. JONES ACT NEGLIGENCE

The doctrine of comparative fault, to wit, that the contributory negligence of a plaintiff does not bar recovery, applies to the plaintiff's Jones Act negligence claim. The Jones Act incorporates by reference the Federal Employers Liability Act (45 U.S.C. §51 et seq.).[1] The Federal Employers Liability Act (hereinafter referred to as "FELA") contains is a comparative fault statute (45 U.S.C.A. §53). The first part of Section 53, which is entitled "Contributory negligence; diminution of damages," states:

> "In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar recovery, but the damages shall be diminished by the jury in proportion to the amount of

[1] The Jones Act states: "A seaman injured in the course of his employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee shall apply to an action under this section.: 46 U.S.C.A. §30104; accord *Kernan v. American Dredging Co., 355 U.S. 426, 439, 78 S.Ct. 394, 401-07, 2 L.Ed.2d 382 (1958)*.

negligence attributable to such employee:" (emphasis added)

The doctrine of comparative fault applies to the plaintiff's Jones Act negligence claim by virtue of Section 53.

B. UNSEAWORTHINESS

The doctrine of comparative fault also applies to the plaintiff's independent claim for Unseaworthiness under the General Maritime Law. In the case of *United States v. Reliable Transfer, 421 U.S. 397 (1975)*, the U.S. Supreme Court changed the admiralty rule of divided damages and adopted the doctrine of comparative fault

PRIMARY DUTY RULE

In addition to comparative fault, the defendant maintains that the plaintiff is barred from recovering pursuant to the Primary Duty Rule. The Primary Duty Rule provides that a seaman may not recover against his employer for Jones Act negligence or Unseaworthiness when the seaman's injuries are solely caused by his breach of a consciously assumed duty to maintain safe conditions onboard the vessel. *Wilson v. Maritime Overseas Corp., 150 F.3d 1, 12 (1st Cir. 1998)*. The Primary Duty Rule

"turns really not upon any question of 'proximate cause,' 'assumption of risk' or 'contributory negligence,' but

rather upon the employer's independent right to recover against the employee for the non-performance of a duty resulting in damage to the employer, which in effect offsets the employee's right to recover against the employer for failure to provide a safe place to work." *Dixon v. United States, 219 F.2d 10, 16-17 (2d Cir. 1955)*. *Peymann v. Perini Corp., 507 F.2d 1318 (1st Cir. 1975)* is a classic example of the Primary Duty Rule. In that case, the vessel's Chief Engineer was responsible for maintaining the engine room in a safe and seaworthy condition. Prior to the incident, the Chief Engineer was aware that the vessel's cylinder head dripped oil. While climbing over a rail in the engine room, the Chief Engineer slipped and injured himself as a result of the dripping oil. The jury returned a verdict in favor of the defendant vessel owner and the Chief Engineer appealed. In affirming the application of the Primary Duty Rule, the First Circuit stated that there was sufficient evidence for the jury to conclude that:

> "it was plaintiff's primary duty to maintain the engineroom in a seaworthy condition, and that his conduct in stepping on the rail without first wiping off the oil, placed there by his own conduct, was his sole responsibility."

*Id. at 1322-24; Walker v. Lykes Bros. S.S., 193 F.2d 772 (2d Cir. 1952).* The Plaintiff admits that he was the deck boss responsible for the workings of the deck under the supervision and control of Captain Wheeler. The defendant maintains that the Plaintiff himself actually lifted the line over the bit, thereby eliminating any restraint on the line and allowing it to sweep the deck and propelling the Plaintiff overboard. All witnesses admit that this was not a safe procedure. Captain Wheeler was in the wheelhouse of the vessel operating the controls and was not aware that the Plaintiff had lifted the line over the bit.

LIMITATION OF LIABILITY

The defendant contends that its liability is limited to the value of its vessel at the time of the incident pursuant to the Limitation of Shipowners' Liability Act ("Limitation Act"), 46 U.S.C.A. §30510 et seq.[2] The Limitation Act allows an owner to limit its liability to the value of its interest in the vessel, if the owner can establish that it lacked privity or knowledge of the act or condition that caused the injury. The Limitation Act does not define the phrase "privity or knowledge," but its

[2] The Limitation Act was formerly 46 U.S.C.A. §183 et seq. In 2006 the act was reauthorized and given a new number.

central meaning has been clarified by the U.S. Supreme Court. Privity or knowledge requires some degree of personal participation by the owner in the fault or negligence causing the injury.[3]

Where the vessel is owned by a corporation, the test is whether the culpable participation or neglect of duty can be attributed to a corporation's "executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." *Coryell v. Phipps, 317 U.S. 406, 410-11 (1943)("A corporation necessarily acts through human beings. The privity of some of those persons must be the Privity of the corporation else it could always limit its liability. Hence the search in those cases is to see where in the managerial hierarchy the fault lay"). See also Carr v. PMS Fishing Corp., 191 F.3d 1, 4 (1st Cir. 1999).*

The Limitation Act "affords protection to the physically remote owner who, after the ship breaks ground, has no effective control over his water-borne servants." *Tittle v. Aldacosta, 544 F.2d 752, 756 (5th Cir. 1977)*. As such, the privity or knowledge of the vessel's crewmembers is

---

[3] *Coryell v. Phipps, 317 U.S. 406, 410-11 (1943); Carr v. PMS Fishing Corp., 191 F.3d 1, 4 (1st Cir. 1999).*

not attributed to the vessel owner for limitation purposes. *Id.; Complaint of G.b.R.M.S. CALDAS, 350 F.Supp. 566, 573 (E.D.Pa. 1972)("A shipowner is entitled to exoneration or limitation unless there is personal privity or knowledge of the shipowner or, in the case of a corporate owner, of the managing officers or agents. The negligence of the master, chief engineer, ship's officers or seamen does not deprive an owner of the statute's protection")*.

Accordingly, in the typical situation involving a corporate owner, the determination focuses on whether the vessel's shore-based high-level management possessed privity or knowledge of the act or condition that caused the injury. *Id.; accord Carr v. PMS Fishing Corp., 191 F.3d 1, 4 (1st Cir. 1999).* In determining whether a corporate employee is management whose knowledge precludes limitation, the following factors may be considered:

(1) The scope of the employee's authority over day-to-day activity in the relevant field of operations;

(2) The relative significance of this field of operations to the business of the corporation;

(3) The employee's ability to hire or fire other employees;

(4) The employee's power to negotiate and enter into contracts on behalf of the company;

(5) The employee's authority to set prices;

(6)The employee's authority over the payment of expenses;

(7) Whether the employee's salary is fixed or contingent, and;

(8) The duration of the employee's authority, i.e., full-time of restricted to a specific shift.

*In Re Hellenic Inc., 252 F.3d 391 (5th Cir. 2001).*

This Honorable Court will determine whether the defendant is entitled to limit its liability. In making its determination, the Court must first determine whether the defendant's negligence or unseaworthiness caused the accident. Second, the Court must determine whether the defendant's shoreside management was privy to, or had knowledge of, "the particular act of negligence or condition of unseaworthiness. *Carr v. PMS Fishing Corp., 191 F.3d 1, 4-6 (1st Cir. 1999).* To the extent the plaintiff establishes negligence and/or unseaworthiness, it will be the defendant's burden to establish lack of privity or knowledge. *Id.*

Here, it seems clear that Limitation of Liability will apply and it was raised in Defendant's Answer as an Affirmative Defense. Captain Wheeler was an officer of the corporation and therefore his knowledge would be attributed to the corporation. However, even using Plaintiff's version of liability that Captain Wheeler was

negligent in his operation of the vessel, this would constitute operational negligence at best. Plaintiff does not point to any condition which predated the commencement of the voyage. A single act of operational negligence does not render the vessel unseaworthy. *Usner v. Luckenbach Overseas Corp., 400 U.S. 494 (1971).*

The general procedure is for the parties to reserve the issue of the vessel's value until after the trial. If limitation becomes an issue, the defendant will offer evidence concerning the vessel's value after the jury trial. The parties will then submit their respective Findings and Fact and Conclusions of Law on the limitation issues, to wit, privity and knowledge and value.

## IV. ANTICIPATED MOTIONS IN LIMINE

Defendant anticipates filing 2-3 Motions in Limine concerning opinions offered by a lay witness, qualifications of the Plaintiff's liability expert and admissibility of evidence. Defendant will file same within one week of the trial.

## V. PROBABLE LENGTH OF TRIAL

Defendant anticipates the trial of this matter will take 3-4 trial days, assuming a 9AM-1PM trial schedule.

By its attorneys,

**CLINTON & MUZYKA, P.C.**

"/s/Robert E. Collins"
**Robert E. Collins**
**Bar No. 2951**
One Washington Mall
Suite 1400
Boston, MA 02108
(617)723-9165

CERTIFICATE OF SERVICE

Baluch, Gianfrancesco, Mathieu
& Alger
155 South Main Street
Suite 101
Providence, RI 02903
Attn: Dennis S. Baluch, Esquire

I hereby certify that I electronically filed **Defendant's Pre-trial Memorandum** on November 1, 2007. This document is available for viewing and downloading from the Court's Electronic Case Filing System. Service on the above counsel has been effectuated by electronic means.

"/s/Robert E. Collins"
Robert E. Collins